UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                   )
BAPTIST MEMORIAL HOSPITAL,         )
d/b/a BAPTIST MEMORIAL             )
HOSPITAL-MEMPHIS                   )
                                   )
            Plaintiff,             )
                                   )    Civil Action No. 07-cv-1938 (RCL)
      v.                           )
                                   )
KATHLEEN SEBELIUS, Secretary,      )
U.S. Department of Health and Human)
Services,                          )
                                   )
            Defendant.             )
_____)

## MEMORANDUM OPINION

Before the Court is plaintiff's Motion [28] for Summary Judgment, defendant's Cross-Motion [32] for Summary Judgment, and defendant's Motion [44] to Strike Plaintiff's Surreply. Upon consideration of the summary judgment motions, the memoranda in support thereof, the supplemental authority, the entire record, and the applicable law, the Court will DENY plaintiff's Motion for Summary Judgment and GRANT defendant's Cross-Motion for Summary Judgment. Upon consideration of defendant's Motion to Strike, the opposition thereto, and the applicable law, the Court will GRANT defendant's motion. The Court's reasoning is set forth below.

### I. BACKGROUND

In this consolidated action, plaintiff Baptist Memorial Hospital-Memphis (Baptist-Memphis) seeks additional Medicare payments authorized for disproportionate share hospitals (DSH)—i.e., hospitals that treat a disproportionate share of low-income patients. Specifically, Baptist-Memphis seeks the inclusion of what are known as Section 1115 demonstration or expansion waiver days in the DSH payment calculation in connection with two Medicare cost

1

reporting periods—Fiscal Year Ending (FYE) September 30, 1994, and FYE September 30, 1995. The Medicare Provider Reimbursement Review Board (PRRB) entered decisions in favor of Baptist-Memphis as to its appeals for both reporting periods. The Secretary's Administrator of the Centers for Medicare and Medicaid Services (CMS) reversed both decisions. Baptist-Memphis challenges those reversals here.

### A. Statutory and Regulatory Background

The operating costs of inpatient hospital services are primarily paid through the Prospective Payment System (PPS), 42 U.S.C. § 1395ww(d). Generally, a hospital's PPS payment is based on prospectively determined rates, rather than on actual operating costs incurred by the hospital. *Id.* § 1395ww(d)(1)–(4). But the PPS also contains several provisions that adjust payments on the basis of hospital-specific factors. *Id.* § 1395ww(d)(5). One such provision is known as the disproportionate share hospital or DSH adjustment, under which hospitals that serve a "significantly disproportionate number of low-income patients" receive increased PPS payments. *Id.* § 1395ww(d)(5)(F)(i)(I).

A hospital qualifies for a DSH adjustment in a given cost reporting period if its "disproportionate patient percentage" for that period equals or exceeds specified thresholds. *Id.* § 1395ww(d)(5)(F)(v). The disproportionate patient percentage consists of two components: the Medicare and Medicaid fractions. *Id.* § 1395ww(d)(5)(F)(vi). Only the Medicaid fraction is relevant here. This fraction equals "the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistances under a State plan approved under [Title XIX, i.e., the Medicaid statute]," divided by "the total number of the hospital's patient days for such period." *Id.* § 1395ww(d)(5)(F)(vi)(II).

Title XIX of the Social Security Act, known as the Medicaid statute, establishes a federal-state program to provide medical assistance to low-income patients. *See id.* §§ 1396–1396v. To participate in the Medicaid program, a state must develop a plan that specifies, among other things, the categories of individuals who will receive medical assistance and the kinds of services that will be covered. *Id.* § 1396a. If the Secretary approves the plan, the state is eligible to be reimbursed by the federal government for a specified percentage of expenditures under the plan. *Id.* §§ 1396b(a)(1), 1396d(b).

Section 1115 of the Social Security Act also authorizes demonstration projects to allow states to explore innovative healthcare initiatives. *See id.* § 1315. Costs under a Section 1115 demonstration project "shall, to the extent and for the period prescribed by the Secretary, be regarded as expenditures under the State [Medicaid] plan." *Id.* § 1315(a)(2)(A). Per the Secretary's approval, a demonstration project may provide benefits to individuals who do not otherwise qualify under the Medicaid statute. *Id.* § 1315(a)(1). Individuals who are not eligible for benefits under a Medicaid state plan approved under Title XIX, but who *are* eligible for benefits under an approved Section 1115 demonstration project, are known as "expansion waiver populations" or simply "expansion populations."

Tennessee's approved Section 1115 demonstration project, known as TennCare, was instituted on January 1, 1994. A.R. 640–43. TennCare provided coverage for populations eligible for traditional Medicaid, as well as populations eligible for benefits under expanded requirements for the "uninsurable" (i.e., persons unable to meet traditional requirements due to existing or prior existing heath conditions) and "uninsured" (i.e., persons not eligible for an employer-sponsored or government-sponsored health plan). *Id.* At issue in this case are

expansion populations who are not eligible for traditional Medicaid, but who receive benefits through TennCare.

From the inception of the Medicare DSH adjustment in 1986, the Secretary's policy has been to exclude expansion waiver days in calculating DSH payments. Under the Secretary's regulations, the DSH adjustment would apply only when "benefits are payable under [Title XIX, i.e., the Medicaid statute]." 51 Fed. Reg. 16,777 (1986). There was confusion among hospitals, however, as to which state-only program days qualified as "Medicaid eligible" days that could be included in the DSH calculation. *See St. Joseph's Hosp. v. Leavitt*, 425 F. Supp. 2d 94, 96 (D.D.C. 2006) (Robertson, J.). To address this confusion, CMS sent a letter to the Chairman of the Senate Finance Committee on October 15, 1999. *See* A.R. 755–56. The letter announced that CMS had adopted a "hold harmless" policy under which it would not seek to recoup certain DSH overpayments to hospitals. *Id.* at 755. Specifically, for cost reporting periods beginning before January 1, 2000, CMS's fiscal intermediaries would "not disallow the portion of DSH payment claimed . . . where a hospital had previously claimed and received Medicare DSH payments under the incorrect formula." *Id.* CMS further stated that it would clarify the policy for both its intermediaries and hospitals. *Id.*; *see United Hosp. v. Thompson*, 383 F.3d 728, 740 (8th Cir. 2001) ("The letter explained that [CMS] would not seek to recoup payments to hospitals already made (erroneously) for state-only days, but that in the future hospitals would have to abide by the statutory requirement that only Medicaid days count toward DSH payments.").

On December 1, 1999, CMS issued Program Memorandum A-99-62 (PM A-99-62) to clarify the definition of eligible Medicaid days in its DSH policy and to formalize its hold harmless policy. *See* A.R. 171–76. PM A-99-62 reiterated that only Title XIX Medicaid days—not, among other things, expansion waiver days—were to be included in the Medicaid fraction of

the Medicare DSH formula. *Id.* at 171–72. It acknowledged, however, that some fiscal intermediaries had made DSH payments "attributable to the erroneous inclusion of general assistance of other State-only health program, charity care, Medicare DSH, and/or *ineligible waiver or demonstration population days*" in the Medicaid fraction. *Id.* CMS would thus hold harmless hospitals that had already received payments reflecting the erroneous inclusion of ineligible days. *Id.* at 173. Likewise, CMS would hold harmless hospitals that had not received such payments, but that had already raised a challenge seeking to include ineligible days in the DSH adjustment. *Id.*

With regard to this second group of hospitals—those that had not received payments reflecting the erroneous inclusion of ineligible days—PM A-99-62 instructs fiscal intermediaries, in relevant part:

> If a hospital did not receive any payment based on the erroneous inclusion of . . . [among other things] waiver or demonstration population days [i.e., expansion days] for cost reports that were settled before October 15, 1999, and the hospital never filed a jurisdictionally proper appeal to the [PRRB] on this issue, you are not to pay the hospital based on the inclusion of these types of days for any open cost reports for cost reporting periods beginning before January 1, 2000.
>
> If, for cost reporting periods beginning before January 1, 2000, a hospital that did not receive payments reflecting the erroneous inclusion of otherwise ineligible days *filed a jurisdictionally proper appeal to the PRRB on the issue of the exclusion of these types of days from the Medicare DSH formula before October 15, 1999, reopen the cost report* at issue and revise the Medicare DSH payment to reflect the inclusion of these types of days as Medicaid days. . . .
>
> Where, for cost reporting periods beginning before January 1, 2000, a hospital *filed a jurisdictionally proper appeal to the PRRB on the issue of the exclusion of these types of days from the Medicare DSH formula on or after October 15, 1999, reopen the settled cost report* at issue and revise the Medicare DSH payment to reflect the inclusion of these types of days as Medicaid days, but *only if the hospital appealed, before October 15, 1999, the denial of payment for the days in question in previous cost reporting periods*. . . .

5

> *Do not reopen a cost report* and revise the Medicare DSH payment to reflect the inclusion of these types of days as Medicaid days *if, on or after October 15, 1999, a hospital added the issue of the exclusion of these types of days to a jurisdictionally proper appeal already pending before PRRB on other Medicare DSH issues* or other unrelated issues.

*Id.* at 173–74 (emphasis added).

### B. Factual and Procedural Background

#### 1. Audit of FYE 1994

During the time period relevant to this case, plaintiff Baptist-Memphis was owned and operated by Baptist Memorial Healthcare Corporation (BMHCC). As a participant in the Medicare program, Baptist-Memphis filed a cost report for FYE September 30, 1994 (FYE 1994), in which it claimed, among other things, a DSH adjustment of $3,414,608. *Id.* at 1471. In its initial FYE 1994 cost report, Baptist-Memphis reported a total of 14,097 patient days for inclusion in the DSH calculation. Pl.'s Summary Judgment Motion (Pl.'s SJM) at 12; A.R. 114. This number included Medicaid-eligible TennCare days as well as TennCare expansion waiver days. Pl.'s SJM at 13; A.R. 122. On October 1, 1996, prior to auditing the FYE 1994 cost report, the Intermediary advised Baptist-Memphis that it was inappropriate to include expansion waiver days in the DSH calculation. A.R. 121. The Intermediary thus instructed Baptist-Memphis to exclude expansion waiver days, thereby limiting the number submitted for audit to traditional Medicaid-eligible days. Pl.'s SJM at 13; A.R. 121, 127–28.

In response to the Intermediary's directive, Baptist-Memphis submitted a revised listing of TennCare days that *did not include expansion waiver days*. Pl.'s SJM at 13; A.R. 121, 127–28. The revised listing reported 9,163 Medicaid-eligible days.[1] Thus, by the time of the audit,

---

[1] Prior to the Intermediary's audit, the State of Tennessee issued a report on TennCare days. The report indicated that Baptist-Memphis had 9,163 Medicaid-eligible days and 2,020 expansion

Baptist-Memphis's TennCare listing had "been purified to the strictly Title [XIX] eligible days." A.R. 123. The Intermediary performed an audit of this revised listing. Pl.'s SJM at 13. There is no dispute that the Intermediary audited *only* Medicaid-eligible days, not expansion waiver days. *See* Pl.'s SJM at 13; A.R. 123, 128.[2]

Upon completing the audit, the Intermediary issued a Notice of Program Reimbursement (NPR) for FYE 1994. *See* A.R. 1457–75. The NPR included a copy of Audit Adjustment # 49, which reduced Baptist-Memphis's as-filed DSH payment claim of $3,414,608 to $2,788,776 (thereby resulting in a disallowance of $625,832). *Id.* at 1471. Audit Adjustment # 49 offers an explanation indicating only that it is a "disproportionate share adjustment . . . per Intermediary." *Id.* It refers to Workpaper T-100, which lists only Medicaid-eligible days (including Medicaid-eligible TennCare days). *Id.* at 231.

Workpaper T-100's listing of Medicaid-eligible TennCare days refers to Workpaper T-110. *Id.* Baptist-Memphis concedes that Workpaper T-110 does *not* reflect an audit of the 14,097 days submitted in its initial cost report, as expansion waiver days were excluded *prior* to the audit. Pl.'s Reply at 4–5. Rather, Workpaper T-110 reflects exclusions unrelated to the exclusion of expansion waiver days. It documents, for example, the exclusion of patient days in psychiatric units, which are "not counted for DSH purposes;" of "Medicare/Medicaid crossover" days; of duplicative days; and of days "paid by Medicare, not TennCare." A.R. 234–35.

### 2. Baptist-Memphis's Appeals to the PRRB

---

waiver days. A.R. 117. Baptist-Memphis's revised listing thus reflects the number of Medicaid-eligible days reported by the State of Tennessee.

[2] As Baptist-Memphis's witness testified to the PRRB, all expansion waiver days were "excluded prior to the Intermediary[] performing [its] audits." A.R. 125. Thus, the Intermediary "did not audit the 14,097 days which [were] on the as-filed report, but audited a lesser number, which was . . . the 9,163 days." *Id.* at 128.

7

On March 29, 1998, Baptist-Memphis appealed the Intermediary's DSH adjustment, among other matters, to the PRRB. *See id.* at 1453–56. With respect to the DSH adjustment, the appeal stated:

> The Intermediary incorrectly calculated the Disproportionate Share adjustment. The audit adjustment in question is #49 attached hereto. The reimbursement impact of that adjustment is approximately $75,000.

*Id.* at 1453–54. On April 23, 1998, Baptist-Memphis filed a Joint Statement of Jurisdiction and Issues that used the same language found in its appeal. *Id.* at 1442. On November 29, 1999—after PM A-99-62's October 15, 1999 deadline—Baptist-Memphis filed a Preliminary Position Paper (PPP) regarding its appeal.[3] The PPP specifically addressed the Intermediary's exclusion of expansion waiver days from the DSH adjustment. *Id.* at 65–66. Additionally, Baptist-Memphis's estimated reimbursement impact increased to $623,832—that is, the disallowance amount in Audit Adjustment # 49. *Id.* at 65. According to Baptist-Memphis, the PPP confirms that it specifically identified the exclusion of expansion waiver days in its March 1998 appeal. Pl.'s Reply at 7. The Secretary disagrees, arguing that the PPP represents "an improper attempt to add the issue of the exclusion of expansion days" to the March 1998 appeal. Def.'s Reply at 12.

On June 28, 2004, Baptist-Memphis advised the PRRB that it had administratively resolved all but one issue on appeal—that of the exclusion of TennCare expansion waiver days from its DSH adjustment. A.R. 1413. On June 29, 2007, the PRRB issued its decision in the FYE 1994 appeal. *See id.* at 82–88. The PRRB determined that Baptist-Memphis was entitled to hold

---

[3] The PPP is not part of the administrative record, as such papers are not filed with the PRRB. Rather, parties to PRRB proceedings serve these papers on each other. Therefore, the Court must rely on the record's explanation of the PPP's contents.

harmless treatment because it had "filed a jurisdictionally proper appeal to the Board before the October 15, 1999 deadline established by PM [A-99-62]." *Id.* at 88.

On August 19, 2005, Baptist-Memphis also appealed the Intermediary's audit for FYE 1995. *See id.* at 1776–79. Its appeal letter included the issue of whether the Intermediary had improperly excluded expansion waiver days from its DSH adjustment for FYE 1995. *Id.* at 1774–75. On August 30, 2007, the PRRB issued its decision in the FYE 1995 appeal. *See id.* at 246–54. As in the FYE 1994 appeal, the PRRB determined that Baptist-Memphis was entitled to hold harmless treatment because it had "filed a jurisdictionally proper appeal to the Board before the October 15, 1999 deadline established by PM A-99-62." *Id.* at 253–54.

### *3. BMHCC's Group Appeal*

While Baptist-Memphis's appeals were pending, BHMCC was pursuing a group appeal comprising several hospitals and cost years, including those at issue here. Def.'s Summary Judgment Motion (Def.'s SJM) at 23. The issue on appeal was whether the Secretary's exclusion of expansion waiver days from the DSH calculation violated the Medicare statute. *Id.* at 24. The group appeal thus involved a statutory challenge, while Baptist-Memphis's individual appeals sought hold harmless treatment under PM A-99-62. The group and individual appeals sought the same relief—the inclusion of expansion waiver days prior to January 2000 in the DSH calculation. *See id.* at 22–25.

The individual appeals originally included a statutory challenge, but Baptist-Memphis asked the PRRB to transfer that issue to the group appeal. *Id.* at 22–23. The Intermediary objected to such bifurcation, advising the PRRB that it would be improper to hear the individual FYE 1994 appeal. A.R. 1227–28. The PRRB acknowledged that the individual and group appeals presented "two different arguments for achieving the same end." *Id.* at 1221.

9

Nevertheless, the PRRB decided to hear the FYE 1994 appeal because the hold harmless argument in that case was "not common to [the argument] in the group appeal." *Id.*

Ultimately, BMHCC's group appeal reached the Court of Appeals for the D.C. Circuit. In a consolidated case, the Court rejected BHMCC's statutory challenge, holding that "[t]he Deficit Reduction Act [Section 5002, which gives the Secretary discretion to determine whether to include expansion waiver days in the DHS calculation] did not retroactively alter settled law." *Cookeville Reg'l Med. Ctr. v. Leavitt*, 531 F.3d 844, 849 (D.C. Cir. 2008). Rather, Congress simply ratified the Secretary's earlier policies, including her policy regarding expansion waiver days prior to January 2000, by "clarif[ying] an ambiguity in the existing legislation." *Id.*

### *4. CMS's Decisions in the FYE 1994 and 1995 Appeals*

On August 29, 2007, CMS vacated the PRRB's decision in the FYE 1994 appeal. A.R. 2–15. First, CMS concluded that Baptist-Memphis had not filed a jurisdictionally proper appeal on the specific issue of expansion waiver days prior to October 15, 1999, and thus did not qualify for hold harmless treatment under PM A-99-62. *Id.* at 2–13. Second, CMS concluded that, in any event, the PRRB had violated *res judicata* principles by bifurcating alternative legal arguments in pursuit of the same relief. *Id.* at 13–14. On October 29, 2007, CMS relied on similar reasoning to vacate the PRRB's decision in the FYE 1995 appeal. *See id.* at 2–21. CMS's decisions constitute the Secretary's two final decisions at issue in this case.

## II. DISCUSSION

### A. Standard of Review

Review of CMS's decisions is governed by 42 U.S.C. § 1395oo(f)(1), which incorporates the Administrative Procedure Act (APA), 5 U.S.C. § 706. Accordingly, a court may set aside final agency action only when it is "arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with law" or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A),(E). Under both the "arbitrary and capricious" and "substantial evidence" standards, the scope of review is narrow and a court must not substitute its judgment for that of the agency. *Motor Veh. Mfrs. Ass'n v. State Farm Mutual Ins. Co.*, 462 U.S. 29, 43 (1983); *Gen. Teamsters Local Union No. 174 v. Nat'l Labor Relations Bd.*, 723 F.2d 966, 971 (D.C. Cir. 1983). As long as an agency has "examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made," a reviewing court will not disturb the agency's action. *MD Pharm., Inc. v. Drug Enforcement Admin.*, 133 F.3d 8, 16 (D.C. Cir. 1998). The burden of showing that an agency's action violates the APA falls on the provider. *Diplomat Lakewood Inc. v. Harris*, 613 F.2d 1009, 1018 (D.C. Cir. 1979); *St. Anthony's Health Ctr. v. Leavitt*, 579 F. Supp. 2d 115, 119 (D.D.C. 2008).

### B. Analysis

Baptist-Memphis argues that the Secretary's conclusion that it was not entitled to hold harmless treatment was not supported by substantial evidence and was arbitrary and capricious. Baptist-Memphis further contends that PM A-99-62 set an improper retroactive deadline in violation of the Medicare statute, the APA, and the Supreme Court's prohibitions on retroactive rulemaking. Finally, Baptist-Memphis argues that the Secretary's application of *res judicata* principles was inappropriate and contrary to her regulations regarding PRRB group appeals.

#### 1. *PM A-99-62's October 15, 1999 deadline is not an improper retroactive rule.*

Baptist-Memphis asserts that PM A-99-62 set an improper retroactive deadline by requiring hospitals to have appealed the exclusion of expansion waiver days before October 15, 1999—two months prior to the PM's issuance on December 15, 1999. Pl.'s SJM at 32–33. This argument assumes, however, that hospitals were entitled to include expansion waiver days in the

DSH calculation prior to the PM's issuance. Indeed, they were not. The Secretary's policy prior to January 2000 was to exclude expansion waiver days from the DSH calculation. *Cookeville*, 531 F.3d 844, 848 (2008). Furthermore, hospitals—including those in Tennessee—were "on notice that the expansion population might not be included." *Id.* PM A-99-62 merely clarified the Secretary's existing policy. *See United Hosp. v. Thompson*, No. 02-3479, 2003 WL 21356086, *5 (D. Minn. June 9, 2003) (holding that PM A-99-62 was not a policy change requiring notice to hospitals, but a "clarification of existing policy").

PM A-99-62 served a limited purpose—to hold harmless, subject to certain conditions, those hospitals that had an honest misunderstanding regarding the DSH calculation. Such hospitals could gain DSH payments they would not have otherwise received on the basis of antecedent facts—namely, whether they had specifically appealed the exclusion of expansion waiver days before October 15, 1999. As the Supreme Court has repeatedly held, a rule "is not made retroactive merely because it draws upon antecedent facts for its operation." *Regions Hosp. v. Shalala*, 522 U.S. 448, 456 (1998) (quoting *Landgraf v. USI Film Products*, 511 U.S. 244, 269 n.24 (1994)) (quotation marks omitted).

### 2. *The Secretary's conclusion that Baptist-Memphis did not meet PM A-99-62's hold harmless requirements was both reasonable and supported by substantial evidence.*

The Court finds that the Secretary's conclusion that Baptist-Memphis failed to specifically appeal the exclusion of expansion waiver days before October 15, 1999 was both reasonable and supported by substantial evidence. Baptist-Memphis's March 1998 appeal simply states that "[t]he Intermediary incorrectly calculated the Disproportionate Share adjustment." A.R. 1453–54. On its face, the appeal makes no mention of expansion waiver days. The appeal references Audit Adjustment # 49, which—as the Court found above—simply reduces Baptist-

12

Memphis's as-filed DSH payment claim of $3,414,608 to $2,788,776. *Id.* at 1471. It makes no reference to expansion waiver days, indicating only that it is a "disproportionate share adjustment . . . per Intermediary." *Id.* Indeed, as Baptist-Memphis concedes, expansion waiver days were excluded *prior* to the audit, and thus prior to the Intermediary's calculation of the DSH adjustment. *See* Pl.'s SJM at 13. The Court thus finds that Audit Adjustment # 49 reflects a calculation based on an audit of *Medicaid-eligible* days only. *See* A.R. 125, 128.

Workpaper T-100, to which Audit Adjustment # 49 refers, lists *Medicaid-eligible* days and makes no reference to expansion days. *See id.* at 231. Similarly, Workpaper T-110, to which Workpaper T-100 refers, reflects exclusions unrelated to the exclusion of expansion waiver days. *See id.* at 234–35. Indeed, Baptist-Memphis concedes that Workpaper T-110 does not reflect an audit of expansion waiver days. Pl.'s Reply at 4–5.

There is nothing—neither on the face of the appeal, nor in Audit Adjustment # 49 or its associated workpapers—to indicate that Baptist-Memphis intended to specifically appeal the exclusion of expansion waiver days in its March 1998 appeal. Baptist-Memphis maintains that the Intermediary "excluded all expansion waiver days, as evidenced by Audit Adjustment 49." Pl.'s SJM at 29. Specifically, Baptist-Memphis argues that Audit Adjustment # 49 reflects the exclusion of expansion waiver days because it reduces the hospital's as-filed claim of $3,414,608—a figure that had been based in part on expansion waiver days. But as the record clearly indicates, and as Baptist-Memphis concedes, expansion waiver days were excluded prior to the Intermediary's audit. *See* Pl.'s SJM at 13; Pl.'s Reply at 4–5; A.R. 121, 127–28. Audit Adjustment # 49 merely reports Baptist-Memphis's as-filed claim; there is no indication that this figure had any bearing on the Intermediary's *calculation* of the DSH adjustment. As the Court found above, that calculation was based on an audit of Medicaid-eligible days only. Absent any

13

reference to the exclusion of expansion waiver days in Audit Adjustment # 49 or its associated workpapers, this Court finds no indication that Baptist-Memphis intended to specifically appeal that issue in its March 1998 appeal.[4]

Baptist-Memphis challenges the Secretary's inference that the $75,000 identified in its appeal as the "reimbursement impact of [the Intermediary's] adjustment" was too low a figure to reflect an appeal regarding the exclusion of expansion waiver days. Baptist-Memphis asserts that this figure was merely a "placeholder given the Hospital's inability to calculate a more accurate figure due to the Intermediary's refusal to audit the expansion waiver days claimed on its as-filed cost report." Pl.'s Reply at 15. Baptist-Memphis argues that the Secretary's inference finds no support in the record and thus fails to meet the substantial evidence standard. *Id.*

The Court finds that the Secretary's inference was not necessary to her determination that Baptist-Memphis failed to specifically appeal the exclusion of expansion waiver days before October 15, 1999. As discussed above, there was substantial evidence to support this conclusion. The $75,000 figure was just one piece of circumstantial evidence the Secretary considered in reaching her conclusion. Furthermore, the Secretary's inference was reasonable. Prior to vacating the PRRB's decisions, CMS estimated that the payment for Baptist-Memphis's 2,020 expansion waiver days, had they been included in the DSH calculation, would have been $500,000. A.R. 65. Notably, Baptist-Memphis's estimated reimbursement impact increased to $625,832 in its November 29, 1999 PPP—which, coincidentally, specifically addressed the exclusion of

---

[4] Because Baptist-Memphis filed its FYE 1995 appeal on August 19, 2005, it is entitled to hold harmless treatment "only if the hospital appealed, *before* October 15, 1999, the denial of payment for the days in question in *previous cost reporting periods* [in this case, FYE 1994]." A.R. 174 (emphasis added). Substantial evidence supports the Secretary's conclusion that Baptist-Memphis was not entitled to hold harmless treatment for FYE 1994—and consequently, that it was not entitled to hold harmless treatment for FYE 1995.

expansion waiver days. *Id.* But Baptist-Memphis was well aware of the Intermediary's $625,832 disallowance when it filed its March 1998 appeal, and thus presumably had no need to use a much lower "placeholder." Based on this evidence, the Secretary reasonably inferred that the $75,000 figure was too low to reflect an appeal regarding the exclusion of expansion waiver days. Indeed, "substantial evidence 'need not be overwhelming evidence.'" *Mail Order Ass'n of Am. v. U.S. Postal Serv.*, 2 F.3d 408, 421 (D.C. Cir. 1993) (quoting *Japan Air Lines Co. v. Dole*, 801 F.2d 483, 489 (D.C. Cir. 1986)). Rather, "an agency must have latitude to draw permissible inferences from and to make findings based on the evidence in the record." *Id.*

Baptist-Memphis also asserts that its PPP "specifically addressed the Intermediary's exclusion of expansion waiver days," thus confirming that it intended to appeal that issue in its March 1998 appeal. Pl.'s Reply at 7. But this argument ignores PM A-99-62's requirements. A hospital is entitled to hold harmless treatment only if it "filed a jurisdictionally proper appeal to the PRRB on the issue of the exclusion of these types of days from the Medicare DSH formula *before* October 15, 1999." A.R. 173 (emphasis added). Baptist-Memphis's PPP, submitted *after* PM A-99-62's deadline, is thus irrelevant to the question of whether Baptist-Memphis is entitled to hold harmless treatment.

The Court is unconvinced by Baptist-Memphis's argument that the PRRB "gave great weight [to the PPP] as confirmation that the issued appealed from Audit Adjustment #49 was in fact the exclusion of TennCare Waiver Days." Pl.'s Reply at 20. Indeed, in its decision regarding the FYE 1994 appeal, the PRRB stated that it "agrees with the Intermediary that the *Provider's appeal began as a general DSH case*. However, the issue was clarified and expanded in its preliminary position paper." A.R. 88 (emphasis added). This statement simply confirms that

15

Baptist-Memphis first raised the exclusion of expansion waiver days in its PPP—after the deadline set by PM A-99-62.

Finally, Baptist-Memphis argues that the Secretary's decisions were inconsistent with the district court's holding in *St. Joseph's Hospital v. Leavitt*, 425 F. Supp. 2d 94 (D.D.C. 2006) (Robertson, J.). In that case, which raised issues similar to those raised here, the Secretary determined that St. Joseph's was not entitled to hold harmless treatment because its appeal, filed before October 15, 1999, did not specifically raise the exclusion of "general assistance" (non-Medicaid) days. *Id.* at 98. The appeal identified the adjustment number at issue, stating that "the DSH reimbursement is significantly understated. The intermediary did not properly recognize all appropriate DSH related days of service." *Id.* at 97. The attached adjustment number stated that payment was disallowed "since the provider is including non-Medicaid days in their DSH calculation." *Id.* at 99. The attached workpapers, to which the adjustment number referred, indicated that the Intermediary had specifically audited general assistance days and disallowed payment for those days. *Id.*

The court found the Secretary's decision arbitrary and capricious. *Id.* at 100. At the time St. Joseph filed its appeal, the PRRB required that a notice of appeal include only a "*short* explanation of the basis for the dispute" and the audit adjustment numbers at issue. *Id.* at 99 (emphasis in original). The court thus held that the Secretary could not precondition hold harmless treatment on "magic words" in an appeal without considering other evidence—namely, the adjustment numbers and associated workpapers attached to the appeal. *Id.* at 99–100. The court concluded that St. Joseph's "document trail" demonstrated that "the exclusion of general assistance days provided *at least one reason* for the appeal of the DSH allowance." *Id.* at 100 (emphasis in original).

16

This Court finds that the decisions at issue here were consistent with *St. Joseph's*. At the time Baptist-Memphis filed its appeal—as in *St. Jospeh's*—the PRRB required that a notice of appeal include only a "short explanation of the basis of dispute" and the audit adjustment numbers at issue. A.R. 85. But unlike the appeal in *St. Joseph's*, Baptist-Memphis's appeal provided no document trail demonstrating that it specifically raised the exclusion of expansion waiver days. In *St. Joseph's*, the attached adjustment number and workpapers *specifically* indicated that St. Joseph's DSH disallowance was based on its erroneous inclusion of non-Medicaid days. *See St. Joseph's*, 425 F. Supp. 2d at 99–100. Here, in contrast, the Intermediary did not audit expansion waiver days, nor did Audit Adjustment # 49 or its associated workpapers make any reference to the exclusion of expansion waiver days. Consistent with *St. Joseph's*, the Secretary did not merely look for "magic words" in Baptist-Memphis's appeal. Rather, she considered the appeal's document trail and other evidence in the record to determine that Baptist-Memphis was not entitled to hold harmless treatment under PM A-99-62.

As noted above, the Secretary's decisions in this case were based on two independent grounds—first, that Baptist-Memphis did not qualify for hold harmless treatment, and second, that the PRRB violated *res judicata* principles by bifurcating alternative legal arguments in pursuit of the same relief. Because the Court finds that substantial evidence supports the Secretary's decisions on the first ground, it need not address Baptist-Memphis's arguments on the second ground.

### III. DEFENDANT'S MOTION TO STRIKE

The Secretary has moved to strike [44] Baptist-Memphis's surreply [42]. As the Secretary notes, the Local Rules do not authorize surreplies. *See* LCvR 7(b) (permitting parties to file only a single memorandum in opposition to a motion). Accordingly, "[t]he decision to grant

or deny leave to file a surreply is committed to the sound discretion of the court." *Schmidt v. Shah*, 696 F. Supp. 2d 44, 59 (D.D.C. 2010). Leave to file is appropriate when the movant's surreply raises new arguments requiring some additional response. *See United States ex rel. Pogue v. Diabetes Treatment Ctrs. Of Am., Inc.*, 238 F. Supp. 2d 270, 275–75 (D.D.C. 2002) ("A surreply may be filed only by leave of Court, and only to address new matters raised in a reply to which a party would otherwise be unable to respond.").

Baptist-Memphis failed to move for leave to file its surreply. But even had it done so, the Court would not have granted leave because the Secretary's reply [39] does not raise new matters requiring an additional response. The Secretary's reply merely expands on previously-made arguments or responds to arguments raised by Baptist-Memphis. Therefore, the Court in its discretion will grant the Secretary's motion to strike.

## IV. CONCLUSION

For the reasons stated herein, plaintiff's Motion [28] for Summary Judgment will be DENIED, defendant's Cross-Motion [32] for Summary Judgment will be GRANTED, and defendant's Motion [44] to Strike Plaintiff's Surreply will be GRANTED.

A separate order consistent with this memorandum opinion shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on February 28, 2011.